11-1-0-9-2-7. Community Memorial Hospital v. Workers' Compensation Comm'n, 4-1-1-0-9-2-7. Council, please. Good morning, Justices. May it please the Court, my name is Elizabeth Topletty and I represent the employer, Community Memorial Hospital. It's respectfully submitted to you that the Commission erred in awarding temporary total disability benefits through October 28, 2008 and permanent total disability benefits. And such decisions are against the manifest way that they happen. Keep your voice up a little louder, please. Certainly. And the facts in this case are relatively straightforward. Claim it's a nurse, she hurts her lower back while lifting a patient on May 6, 2004. This low back injury necessitates two separate surgeries, one in August of 2005 and another in October of 2007. So you're not disputing accident and causation? That's correct. It's just temporary total disability benefits and permanent total disability benefits. So no question as to accident and causal relationship. She was released to return to work with permanent restrictions of 15 pounds and also no repetitive bending, scooping, lifting. She needed to change positions. There's no question her expert testified that she was unemployable and the employer offered evidence of numerous employment opportunities. So Dr. Robson believed claimant had reached MMI as of May 6, 2008, correct? That is correct. The commission found the claimant, however, had not reached MMI until October 28. That is correct. That is correct. And so that's my first argument. And I certainly concede that it is a question of fact as to the duration of temporary total disability benefits. But when the commission makes that decision, they must comport with the law. And the law is clear that in order to award temporary total disability benefits are not awardable once a claimant's condition has stabilized. And when we speak to stability, we generally speak to maximum medical improvement. And Dr. Robson testified very clearly. He testified that as of May 6, 2008, he stated, I felt at that point her x-ray showed a solid fusion. There was nothing else to offer her surgically. She had exhausted all the rehabilitation. I felt she had maxed out on her recovery. And the claimant says, aha, but what about Mr. Slazy, right? Pardon me? And so the claimant says, what about Slazy? Well, the claimant's vocational expert, I don't think she has anything to do with maximum medical improvement. That's a physician's terminology. Well, she may not herself, but there could be contrary evidence. Do you have any cases that say the claimant cannot set forward the opinion of the bulk rehab counselor on whether or not MMI has been reached? A specific case. Obviously, the commission did. Well. You said there's no basis, but the commission did. Certainly. But I think the case law is clear that after you hit MMI, I mean, the cases are legion, say, once you hit MMI. No, but the question is, when did you hit MMI? We're not saying, nobody's disputing once you hit MMI that it doesn't affect the TTD. What we're saying is, what do you consider in reaching that decision? The commission went beyond Robson and looked at other factors, correct? Correct. And I think you could qualify the commission as maybe misstated it and said it was maintenance benefits. I think that MMI speaks to a medical condition, and that is something that is generally determined by a physician. We're talking about her injury and her stability. And I don't think that Ms. Salais actually contradicted that. I mean, she took Dr. Robson's opinion and said, yes, this is correct. This is that she's at maximum medical improvement as of May 6, 2004. And she took his restrictions under consideration in formulating her decision. So I'm not sure, even if we look at her VOC decision, whether or not that is contrary to what Dr. Robson said as to maximum medical improvement. So your position on TTD is rather simple. Robson testified that's the ballgame, in your opinion. I agree, as to temporary total disability benefits. Now, can we argue, is maintenance due during that period of time? I guess there is a question as to whether or not those benefits could be qualified as maintenance benefits. And, you know, was she doing a diligent but unsuccessful job search during that period of time? Was she meeting with a VOC person? And that would then lend to whether or not maintenance would be due. But, no, as to the word of temporary total disability benefits, yes, my position is relatively clear. The question of maintenance is one for the commission to decide. Whether or not they call it TTD versus maintenance? Well, I mean, if we were to agree with you on the TTD and say it stops on May 6, 2008, with Robson's opinion that she reached MMI, and there is no other credible evidence in the record that MMI was reached at some later date, now we've got the question of what happens between May 6, 2008 and the date she's found to be permanently disabled. So my question is, who decides whether she gets maintenance during that period? Well, generally you would vacate and remand it to the commission, yes. Because they've got to decide whether she made a reasonable attempt to obtain work or whatever. Correct. I'm not disagreeing with you. I mean, I think that as the law says that TTD is not due after May 6, 2008, and then it's a question of fact as to whether or not maintenance was, in fact, due. I mean, we've written opinions that said doctors don't have sufficient expertise to testify whether there's jobs available for an individual, because that's within the realm of a voc rehab expert. So should we write an opinion and say voc rehab experts lack the expertise to testify as to whether an injured employee has reached MMI? I would ask you to, yes. I'll turn now to the permanent total disability benefits. There's no question here that she's not medically permanently disabled. I mean, Dr. Robinson does release her to return to work with restrictions. So the question really comes down to does she qualify for permanent total disability benefits under an odd lot theory? And we all know in order to prove entitlement under an odd lot theory, one, show a diligent but unsuccessful job search, or two, demonstrate because of her age, training, education, experience, skills, coupled with her medical treatment that no stable labor market exists. So the first prong, we agree, if you say is a diligent but unsuccessful search for employment, correct? That is correct. According to the commission file, the claimant had contacted a total of 78 employers, and 46 contacts were made in person. We don't often see that. How is that not a diligent job search? Well, I think you have to look not just at the numbers, but you have to look at the quality and the duration of the actual job search. So we're looking at two separate periods here. The first period was from June 5th of 2008 through September 5th of 2008, so two and a half months. In that two and a half month period, there's no doubt she made 36 contacts, which is less than 30. This isn't the usual where somebody's calling somebody over a phone or something, correct? That is correct, but when you look again, you have to look at the quality of them. So in that first period that I spoke about, she looked at no contacts in her area of expertise, healthcare, except for one. I mean, she went to the Arby's, she went to the Costco, I think she went to the Walmart, but she didn't use any of her skills or her expertise in making a job search. And I would submit to you, it's more than just calling up every employer and writing it down on a piece of paper. That's not what it means to do a diligent job search. You really have to look at the quality and the duration of the job search. And this was for one two and a half month period where once a day she called up like a Costco, Arby's, I'm sorry, the rest of them don't come to mind, but none of them other than one was in the healthcare field. Now, I agree she made a second attempt from February 9th of 2009 through March 16th of 2009, and during that period of time she did contact I believe it was 42 employers. But again, only three of those were within her skills or expertise. And of those three that she contacted, the medical providers, the other ones where you said she all went into person, she did go to person according to her job logs, but for the three healthcare providers she just called them on the phone. So no, I would submit to you that's not proof of a diligent job search. You're getting, you're into, I understand you're arguing about the healthcare, that's her field, no question about it. Is there anything in the record indicate there were other healthcare related jobs available in her area which she didn't ask for? You're saying well we have three or four in her field, how do we know there's any others out there that she didn't? Well, I do think there is because there were three labor market surveys, two of which were actually, one was done in June of 2008 and another one that was done in July of 2008. And those, June 24th of 2008 and July 30th of 2008, which does fall within that period of her first job search, and both of those labor market surveys do in fact indicate open jobs within the healthcare field. And those labor market surveys were actually undertaken with the understanding of her restrictions. So those jobs did identify open healthcare positions within her fields within the geographical area. And therefore an opposite conclusion to that drawn by the commission is clearly apparent in your argument. That would be my argument, that is correct, relative to the diligent. Can I ask a question? Certainly. Robeson puts her at MMI on May the 6th, 2008, is that correct? That's correct. All right. They awarded TTD from 6-1-0-4 to 10-28-08. So you're arguing about the TTD that was awarded from 5-6-0-8 to 10-28-08, is that correct? That's correct. Did her medical condition or her condition at all change between May the 6th, 2008, and October the 28th, 2008? No. The last medical record is Dr. Robeson's. Then if we find that she was properly awarded a permanent total and they ran it from 10-29-08 for life, why would we send it back for maintenance? Why wouldn't we just modify it and say she was a permanent total, effective 5-6-0-8? Because the permanent total rate and the TTD rate are exactly the same, $421 a week. Well, it certainly doesn't... I mean, it's 6-1-1-2-0-0-0. You want to call it TTD, you want to call it permanent total. She gets the same amount of money. Well, one, I don't think the evidence indicates that she's actually permanently totaled. No, but if we were to find she's permanently totaled, the only thing we'd do is back up the permanent total to May the 6th, 2008, and start it from there, and she gets exactly the same amount of money as she would if it was TTD. Well, I'm not sure that there would be a legal basis to find it because there's not vocational expert testimony until October of 2008. That's why I asked you the question, had her medical condition changed. And if she's a permanent total in October of 2008, she was a permanent total in May, too. Based upon the vocational... Can't work, can't work. Okay. Presumably, I mean, I can't argue with you if that's the way you feel, that if she's permanently totally disabled. But I would say that that evidence doesn't indicate that she was permanently totally disabled based upon... Well, I understand the argument from October. Okay. So, relative to that argument, I believe that to prove through a vocational expert that it is their requirement to actually look at the claimant's age, training, education, skills, experience. And Ms. Lace just did not do that. She based her entire opinion upon the fact that the claimant had admittedly restrictions, but those restrictions coupled with her inability to access computer skills, computer skills took her out of the labor market. I mean, that was the specifics of her testimony. She stated anything that could be possibly transferable will require some type of computer skills. And because she doesn't have these computer skills, she did not believe she had the ability to access a stable labor market. But I would submit to you that it's more than just looking at the computer skills. You have to look at the claimant's age. She's 49, relatively young woman. She has training. She has education. She's a nurse. She also has an LPM. During her nursing tenure, she didn't just do one aspect of nursing. She did all sorts of numerous aspects of nursing. She went from a floor nurse. She was also an assistant director of nursing. She possessed managerial experience. She worked in a psychiatric unit. She also had cashier experience. She worked in child care. These are all very much transferable skills. She's well educated. She has a lot of experience, but none of that was taken into account. Here's the interesting part of the response to your area. You're listing all of these things that could have been done. The commission found Slazy to be credible. The commission made its findings. For you, the hurdle you would have to overcome is you realize you would have to find that there was no evidence in the record to support the commission's decision. Or in other words, we have to find there's some evidence. If we find there's some evidence in the record to support the commission's decision, you could not win on that basis. Well, I think the standard is that clearly undisputable weight of the evidence compels an opposite conclusion. So I think if you take the evidence as a total and you look at all the weight of the evidence, that it does, in fact, compel an opposite conclusion. Are you asking us to re-weigh the evidence? No, I'm absolutely not asking you to re-weigh the evidence. I think it has to do – but that's what manifest weighted evidence is. I mean, there still is an ability to overturn a decision based upon manifest weighted evidence, correct? Of course, otherwise we wouldn't be here. No, we wouldn't be here. I mean, so I do think that you do have to look at the evidence in its totality. It's not just if there is intelligible evidence, therefore you must affirm it on manifest weight. I mean, I do think that you look at all of it. And I also think that the expert's opinion must be based in the law. And the law dictates that you must look at all of these areas – the age, the experience, the expertise – in formulating opinion. And if she doesn't do so, then her opinion is not valid. And that's really the basis of my argument, is that opinion is just not valid. Whether or not it's credible – she may have testified credibly, but does she have the foundation underneath the opinion to support her statements that the claimant is unemployable? And I would submit to you she doesn't, because her entire opinion rests upon the fact that there are restrictions of 15 pounds. Your time is up, Counselor. Sorry, thank you. Counselor, please. May I please report? My name is Adam Berry, and I'm from the law firm Median Motel. And we represent the affiliate petitioner, Mary Butts. The petitioner respectfully requests this Court to uphold the Commission's decision to award petitioner TTD benefits from June 1, 2004 through October 28, 2008, and PTD benefits starting on October 29, 2008. The petitioner has proven by a preponderance of the evidence that she has entitled PTD benefits through the odd lot theory by showing, one, she performed a diligent but unsuccessful attempt to find work, and two, by showing that because of her age, skills, training, and work history, she will not be regularly employed in a well-known branch of the labor market. Now, in Chicago v. Illinois Workers' Compensation Commission, the first appellate district court said, Whether an employee falls into the odd lot category is a factual determination to be made by the Commission, and that determination will not be set aside unless it is against the manifest weight of the evidence. That court found specifically that the determination of whether an employee falls into the odd lot category is not a question of law subject to de novo, as the respondent has suggested. First, the Commission's decision to award the petitioner permanent total disability benefits because of her age, skills, training, and work history showed that she would not be regularly employed in a well-known branch of the labor market was not against the manifest weight of the evidence. The Commission based its decision on the work restrictions given by Dr. Robson, which included a 15-pound lifting restriction, prohibited repetitive bending, stooping, twisting, or awkward positions, and, as the respondent has missed continuously, a requirement that the petitioner change positions every 20 minutes, as well as Ms. Lila Slase's expert vocational opinion that the petitioner was not employable. The Commission upheld Arbitrator Neal's determination that Ms. Slase's opinion, which was formulated after a review of the medical records and an interview with the petitioner, is entitled to greater weight than any opinions inferred from labor market surveys performed by the respondent specialist, Ms. Linda Peterlin. What about her argument that there were other healthcare-related jobs available in the area, there were surveys, and they were ignored? What do you make of that argument? Well, you're speaking of Ms. Peterlin's labor market surveys? Right. There's many different problems that we've found with that opinion, and first and foremost, Your Honor, I'd like to point out that Ms. Peterlin herself questioned the reliability of those surveys. And I quote her verbatim. She stated, Please note that this specialist did not have any contact with Ms. Butts, and opinions and recommendations in this report may differ if I had the opportunity to speak with Ms. Butts and gather additional information. And what Ms. Peterlin was speaking to, she was correct. I mean, had she had the chance to speak with Ms. Butts, the petitioner, she would have noticed that in her own description of the restrictions placed by Dr. Robson, she stated that the petitioner needed to change positions as needed. Which was incorrect. Dr. Robson stated that the petitioner needed to change positions every 20 minutes. Now, that may seem like a small distinction, but to me, it seems as needed. That may mean that the petitioner would only have to move or change positions a few times a day. But the need to change positions every 20 minutes is a problem, especially for someone in the sedentary form of work where she may need to sit for hours upon time. Peterson, or Peterlin, never met with the claimant, correct? Correct. So did the commission specifically found that Slazy's testimony was entitled to greater weight than Peterlin's labor market surveys? They found that, correct? Correct. And what was Slazy's opinion? Slazy's opinion was that the petitioner was not employable. Based on? Based on the restrictions placed by Dr. Robson. Now, she did feel that she was of the educational level that she could be trained in computer skills. But that because of the restriction causing her to change positions every 20 minutes, it would be difficult for her to even complete a course. And even if she completed a course, she would have a really hard time competing for these jobs. And also, even maintaining a position because of her need to change positions every 20 minutes. And I also apologize, I forgot. The petitioner performed her first job search before she met with Ms. Slace. So Ms. Slace also had the evidence that these employers that the petitioner had contacted had told the petitioner, we can't accommodate your restriction. So the respondent stating that Ms. Slace based her opinion on hypothesis is just incorrect. I mean, she had all the facts in front of her. And I think it was very reasonable for the commission to favor her opinion over some blind labor market. So her unsuccessful job search was basically that. These contacts she made, none of the people would be willing to employ her with those restrictions? Correct. I mean, everyone that she had contacted, not everyone, I apologize. But the majority of the employers that she had contacted had informed her that they were not willing to, or that they could not accommodate her restrictions that were given by Dr. Robson. Dr. Robson's restrictions, those are the restrictions that he gave on May 6, 2008? That's correct, Your Honor. On a discharge? Yes. Thank you. The respondent continues to be upset with the finding. I'm sorry. In Campbell v. Industrial Commission, Illinois Supreme Court stated, it is the commission's duty to determine the credibility of witnesses, the weight to be given to witnesses' testimony, and also to determine the weight to be given to evidence. In Chicago v. Illinois Workers' Compensation Commission, the 1st District Appellate Court stated, a reviewing court will not disturb the commission's determination of factual questions, such as witness credibility, weight given to witnesses' testimony, and weight given to evidence,  and in Board of Trustees v. Southern Illinois University v. NICE, the 5th District Appellate Court stated, a decision is contrary to the manifest weight of evidence only when the court determines that no rational prior fact would have agreed with the agency's decision. In light of the respondent's improper request in the face of well-submitted case law, this court need only determine if any rational prior fact could have agreed with the commission's decision. What happened to the manifest weight? The opposite conclusion is clearly apparent. I'm sorry, what? What happened to the well-settled rule that the manifest weight means an opposite conclusion is clearly apparent? Right. It sounds like you're getting into an abuse of discretion. You're combining them there. Well, if no rational prior fact could find the way the commission found it, I guess it is against the manifest weight, isn't it? Could be, yes. That's a logical point, but you've got to be a little bit careful on that. Yes. I apologize, Your Honor. It's in our case. It's in the case. It's not you. It's in the case. It's you. Don't you. Yeah. Don't feel bad. We had a big fight over this. Not a big fight. I'm sorry. Could you repeat the question? No, that's all right. It's okay. We've covered it. Go on. Continue on. Okay. So I've already pointed out a few of the problems with Ms. Peerlin's labor market surveys. And the obvious, you know, there's a few more left. Ms. Peerlin, for one, never met with the petitioner, the fully evaluator. Ms. Peerlin never contacted any of the employers from her labor market surveys to see if they would be willing to accommodate the petitioner with her work restrictions. And finally, the respondent never gave the results of these surveys to the petitioner so that the petitioner could attempt to contact the employers, proving that this was just a last-ditch attempt to find some employment for the petitioner. In comparison, Ms. Slase's opinion was based on the medical record and an in-person interview with the petitioner, a review of the petitioner's work experience, training, skills, education, as well as her prior job contacts, as well as accurate work restrictions. Ms. Slase relied on her knowledge and education in her field to determine that because of the petitioner's restrictions, most importantly, her need to change positions every 20 minutes, she was not employable. I point to a relevant Illinois case law, or an Illinois case, the Chicago v. Illinois Workers' Compensation Commission, the first district that was decided in 2007. This case involved competing vocational experts offered by the employee and the employer. The employee's expert considered some improper job functions in that case in making his determination. But the commission still favored the employee's vocational expert witness. Even in light of the mistakes of the employee's vocational expert, the appellate court held that the commission's decision was not against the manifest way of the evidence, since the commission is charged with evaluating witnesses and their credibility. If, as in Chicago, it was not against the manifest way of the evidence, to choose a vocational expert's opinion that was based primarily on incorrect information, then it's a clear decision that favoring an informed opinion like Ms. Slase's over a misinformed and self-doubted labor market survey such as Ms. Peterlin's is not against the manifest way of the evidence. Therefore, the commission's decision to award the petitioner PTD benefits should be upheld. What was the misinformation that Peterlin had? Ms. Peterlin stated that the petitioner needed to change positions as needed when the real restriction was she needed to change positions every 20 minutes. It's pretty thin there. Right, but our point of view is you may think change positions as needed could be 20 minutes, as where I could think that change positions as needed could be two hours. Now, I think as something as important as trying to prove that there are positions open to the petitioner, that is a big difference. I mean, if she wants to claim that her surveys are more reliable than our vocational expert's opinion, I would expect her to have the ultimate correct information, and it's obvious that she didn't. Even if that's the commission's call. Right, right. Okay. Yeah, and that's kind of what we're, you know. As stated before, the petitioner can also prove entitlement to PTD benefits through the odd lot theory by showing a diligent but unsuccessful job search. The respondent has argued the commission's decision to award the petitioner with PTD benefits could not be based on the finding that the petitioner performed a diligent but unsuccessful job search. And the respondent is basing this argument on Commissioner Lindsay's dissent, where she stated that the petitioner did not perform a diligent job search. However, it is illogical to assume the commission's opinion based on the dissenting opinion. Rather, it's more logical to assume the commission's opinion, that the majority's opinion, is opposite of the dissenting opinion. I don't think you need to spend a lot of time on that. We're reviewing the commission's majority decision. We're not reviewing the dissenting opinion. Okay. As far as why we feel that she performed a diligent but unsuccessful job search. Because the commission says so? Yes. Okay. And it's not against manifest letter the other. Right. Anything else? Yes, Your Honor. I want to get now to the respondent's burden of protection. As stated by the Illinois Supreme Court in Valley Mold and Iron Company versus the Industrial Commission, after an employee establishes by a preponderance of the evidence that she falls into the odd lot category, the burden of production shifts to the employer to show that the employee is employable in a stable labor market and that such a market exists. And obviously, through what we've already argued, it's our position. The surveys, you say they're not credible. Right. And finally, I'd like to address the TTD issue. The commission's decision to end the petitioner's TTD benefits on October 28th, we feel is not against the manifest way of the evidence. In Ford Motor Company versus Industrial Commission, the First District Appellate Court said that neither the ability to do light work nor receipt of medical treatment preclude a finding of temporary total disability. After her release from Dr. Robson's care on May 6, 2008, the petitioner performed a self-induced job search and underwent vocational assessment with Ms. Slase. The job search was not successful. On October 20th, Ms. Slase determined that the petitioner was not employable. And we feel that a mere eight days after she was determined not employable is not a ruling that is against the manifest way of the evidence to determine that at that point the petitioner's TTD. Did she ever get TTD after she reaches MMI? The answer would be no. Right. No. Right. And essentially, another part of our argument is the dates kind of got mixed up after the arbitration hearing. And whether you start the TTD benefits, as you've already addressed, you could start the TTD benefits on May 6th or October 28th. But if you move the TTD benefits back to May 6th, the PTD benefits are going to start on that date anyway, which is the same amount. It's the same amount of money. We would argue that even if it is an error, it's a harmless error. In conclusion, the petitioner respectfully requests this court to uphold the commission's decision to award the petitioner TTD and PTD benefits because the petitioner is presented by a promoderance of the evidence to support her claim for entitlement to TTD and PTD benefits, and also because the decision by the commission in regards to TTD and PTD benefits are not against the manifest way of the evidence. Thank you. Ms. Arnold, please. Just very briefly. I realize my burden is tough with manifest way of the evidence, but I don't think it's insurmountable. And my argument really is that I don't think that Ms. Soleil's opinion had an accurate foundation, that the foundation of her opinion, even if the commission finds her credible, isn't based in the law. And her opinion is based upon the fact that the woman could not access computer skills. And it's not based upon the fact of her age, her skill, her experience, her education, the factors that you have to really look at as to determine whether or not there is an unstable labor market. And that's what I'm saying, is that Ms. Soleil's opinion is not grounded in the appropriate underlying foundation. Well, let's go back to the computer what? The computer skills. Her opinion, again, and it's specific in her testimony, is she said in correlation to the restrictions being 15 pounds, and as she testified too, that fact coupled with the fact that she could not possess computer skills took her out of the labor market. I mean, that's her opinion. That's what she said the basis of her opinion was, was because she didn't have computer skills. That is what made her unemployed, coupled with the restrictions. But isn't that another factor? Skills? It's one, but that's what I'm saying. It's just one. There's all sorts of other factors that I am saying. If you look at her opinion, she didn't take it into account. And she said she couldn't have the computer, she couldn't access those computer skills because she wouldn't be able to sit in a class. I think that that's speculation. And then she said, and she can't get a job because she's not going to be able to sit long enough. Again, I mean, her opinion is all speculative, and it's not grounded in what the law requires as to the factors. In reviewing whether or not you comply with the statuses of the unemployed. So it's not reasonable to assume that if you're taking a class, and most classes are at least 50 minutes, and you're supposed to move every 20 minutes, that that's going to be difficult? It's certainly difficult, but I mean, the records say, I mean, his record was that she just had to briefly change positions every 20 minutes. It doesn't say anything that she had to get out and walk around. I mean, she just had to briefly change positions. So, no, I don't think that that's unsurmountable. And I think that, you know, I can't sit still for longer than 10 minutes. So, no. So, with that, I would ask that the commission's decision be taken. Thank you. Thank you. Court, we'll take the matter under advisory for disposition. We'll stand on recess for a short period.